## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MARY ANN WRIGHT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10cv00072 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### *I.  Background and Standard of Review*

Plaintiff, Mary Ann Wright, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2011).   Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).   As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of

-1-

more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wright protectively filed her applications for DIB and SSI on or about May 21, 2003. (Record, ("R."), at 53-56, 449-51.) She alleged disability as of January 31, 2003, due to congestive heart failure and emphysema. (R. at 53, 83, 449.) Wright's claims were denied both initially and on reconsideration. (R. at 39-41, 44, 45-47, 456-58.) Wright then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48.) The ALJ held a hearing on November 18, 2004, at which Wright was represented by counsel. (R. at 521-47.) By decision dated January 11, 2005, the ALJ denied Wright's claims. (R. at 19-30.) After the ALJ issued his decision, Wright pursued her administrative appeals, (R. at 14-15), but the Appeals Council denied her request for review. (R. at 8-11.) Wright then filed an action in this court seeking review of the ALJ's unfavorable decision. This court vacated the Commissioner's decision denying benefits and remanded Wright's claims to the Commissioner for further consideration.

On remand, Wright's claim were again denied. (R. at 791-92, 800-07.) Wright then requested another hearing before an ALJ, (R. at 790). The ALJ held a hearing on June 12, 2007, at which Wright was represented by counsel. (R. at 1388-1424.) By decision dated July 12, 2007, the ALJ again denied Wright's claims. (R. at 664-81.) The ALJ found that Wright met the nondisability insured status requirements of

-2-

the Act for DIB purposes through March 31, 2005. (R. at 666.) The ALJ found that Wright had not engaged in substantial gainful activity since the alleged onset date. (R. at 666.) The ALJ also found that the medical evidence established that Wright had severe impairments, namely hypertension, chronic obstructive pulmonary disease, ("COPD"), diabetes mellitus, type II, a bipolar disorder, an anxiety disorder, a personality disorder and a substance addiction disorder in remission. (R. 666.) The ALJ found that Wright did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 667.) The ALJ found that Wright retained the residual functional capacity to perform light work[1] that did not require her to work around smoke, pollen or other respiratory irritants, that did not require more than occasional climbing, balancing, stooping, kneeling, crouching or crawling and that required less than complex tasks. (R. at 677.) The ALJ found that Wright could not perform her past relevant work. (R. at 679.) Based on Wright's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Wright could perform jobs existing in significant numbers in the national economy, including those of a cashier, a retail sales person, an interviewer and a receptionist. (R. at 680.) Thus, the ALJ found that Wright was not disabled under the Act and was not eligible for benefits. (R. at 681.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Wright pursued her administrative appeals, (R. at 658), but the Appeals Council denied her request for review. (R. at 548-50.)

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and/or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

Wright then filed an action in this court seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Wright's motion for summary judgment filed June 9, 2011, and the Commissioner's motion for summary judgment filed August 10, 2011.

## *II. Facts*

Wright was born in 1961, (R. at 53, 524), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with two years of college instruction. (R. at 89.) Wright has past relevant work experience as an x-ray technician, a stocker, a cook in a fast food restaurant and a medical examiner for a life insurance company. (R. at 84, 524-25.)

The administrative record in this case is voluminous and contains medical records going back as far as 2000. These records document diagnosis and/or treatment of a variety of impairments including back, neck and shoulder pain, hypertension, hypothyroidism, diabetes mellitus, type II, anxiety, depression, ovarian cysts, bronchitis, COPD, asthma, congestive heart failure, sleep apnea, peptic ulcer disease, possible stroke, mild brain encephalopathy and pseudoseizures. It appears that many of these diagnoses are based in large part on Wright's history or subjective complaints. Since Wright argues that the ALJ erred in his assessment of her residual functional capacity, the court will focus its summary of the facts on the medical evidence of Wright's mental and physical capabilities.

-4-

The record shows that Wright was examined by a cardiologist, Dr. Pierre Istfan, M.D., on January 6, 2004. (R. at 977.) Dr. Istfan stated that Wright's symptoms of congestive heart failure had been well-compensated. (R. at 977.) He did not place any restrictions on Wright's activities or state that she was disabled. (R. at 977.)

As early as December 30, 2004, Wright told Nurse Practitioner Linda Davidson that Lexapro and Klonopin helped with her anxiety and depression. (R. at 971.) On February 21, 2005, Wright told Davidson that she had walked two miles the day before. (R. at 1178.) On June 10, 2005, Wright complained of right hip pain that Norflex and Naprosyn did not help. (R. at 1168.) On June 29, 2005, Wright's daughter called Davidson's office worried that Wright was taking too much medication because she was like a "zombie." (R. at 1164.)

The record also contains a report of an electroencephalogram, ("EEG"), conducted on Wright on August 4, 2004, while she was being treated inpatient at Wellmont Bristol Regional Medical Center, ("BRMC"). (R. at 1017.) This test came about a week after Wright went into the emergency department on successive days complaining of dizziness and weakness. (R. at 1111-12, 1121-22.) On this particular admission, Wright went to the emergency department on August 3, 2004, with complaints of slurred speech and mild facial numbness. (R. at 1079-82.) The report of Dr. Stephen L. Wayne, M.D., stated that the EEG was abnormal and showed mild slowing and disorganization indicative of a mild encephalopathy, or degenerative brain disease. (R. at 1017.) A report of an MRI of Wright's brain also performed on August 4, 2004, states that Wright was being treated for complaints of slurred speech

-5-

and weakness, with more episodes of expressive aphasia and facial numbness in the previous 24 hours. (R. at 1014.) According to the report, the study showed a mild increased signal in the pons area of the brain which could represent central pontine myelinolysis, or a form of demyelination of the pons occurring in alcoholics. (R. at 1014.) The report noted, however, that there was no mild increased restricted diffusion which would be expected in acute central pontine myelinolysis. (R. at 1014.) It stated that the results could be due to a nonacute infarction or other cause of demyelination. (R. at 1015.) Another MRI performed on December 23, 2004, yielded similar results. (R. at 1013.)

The History and Physical Examination summary from Wright's August 3 admission does not document that she revealed her addiction to cough syrup to her treating physicians. (R. at 1079-82.) Wright denied experiencing any musculoskeletal or psychological problems. (R. at 1081.) She stated that she was having problems with fine motor skills. (R. at 1081.) A video EEG performed overnight from August 5 to August 6, 2004, documented three unusual events. (R. at 1089.) These events, however, were thought to be nonepileptic in nature. (R. at 1089.) Wright was discharged on August 6, 2004, with new diagnoses of speech disorder, probably functional, pseudoseizures and some diastolic dysfunction in her heart, which was shown by echocardiogram. (R. at 1077-78.) It was recommended that Wright see a psychiatrist. (R. at 1078.)

Wright saw Danielle Overton, a family nurse practitioner, on August 16, 2004, complaining of suffering from seizures. (R. at 891-92.) Wright told Overton of her recent hospital admission, during which she was told that she was not suffering from

-6-

seizures and that her problem was psychological. (R. at 891.) Wright told Overton that it was recommended that she see a psychiatrist, but that she was not going to do so. (R. at 891.) Wright continued to treat with Overton and Dr. G. Grat Correll, M.D., throughout 2004. (R. at 875-99.) These notes on several occasions document that there are few objective findings to support Wright's complaints. For example, Wright repeatedly sought treatment for right upper quadrant abdominal pain. (R. at 885-86.) Dr. Correll noted that there was a strong possibility that this complaint was "functional." (R. at 886.) On November 3, 2004, Overton noted, "There are a lot of psychsomatic issues in [Wright's] complaints, and sometimes it is hard to tell how much of it is psychosomatic and how much of it is real." (R. at 880.) On December 6, 2004, Dr. Correll noted that Wright had a "spell" in his office, which was witnessed by Overton. (R. at 876.) Dr. Correll stated that it was not suggestive of "true seizure activity." (R. at 876.) Dr. Correll also noted that Wright asked him to "try to get her out of the classes at the Adult Literacy Center," which Wright claimed she could not do because of her diabetes. (R. at 875.) Dr. Correll noted that there was no reason that Wright could not attend these classes. (R. at 875.)

Wright returned to the BRMC emergency department on August 28, 2004, stating that she could not remember things and may have had a seizure. (R. at 1100-1101.) Wright said her heart was beating fast and she felt short of breath. (R. at 1100.) All her tests were normal, and she was discharged with a diagnosis of heart palpitations. (R. at 1100-01.) Wright returned to the BRMC emergency department on September 25, 2004, complaining of another episode of her heart racing. (R. at 1095-96.) On this occasion, all tests were again normal, and Wright was discharged with a diagnosis of acute hyperventilation symptoms with probable panic attack

features. (R. at 1096.)

Wright was again admitted to BRMC on October 23, 2004, for complaints of left flank pressure. (R. at 1065-67.) While in the emergency department, she claimed that she passed out for approximately five minutes. (R. at 1065.) Wright said that she had not followed her recent hospital admission with any psychiatric evaluation or treatment because she was not "crazy." (R. at 1067.) None of Wright's tests results explained any loss of consciousness. Wright was discharged on October 25, 2004, with additional diagnoses of syncopal episode, questionable as to whether it was vasovagal or a pseudoseizure, and anxiety and depression. (R. at 1063-64.) The treating physician stated that he thought Wright's problem was caused by her underlying anxiety. (R. at 1064.)

On March 1, 2005, Wright saw Dr. Douglas P. Williams, M.D., a neurologist, for complaints with her memory. (R. at 1148.) Dr. Williams stated that he thought her memory problem was due to sleep deprivation due to sleep apnea. (R. at 1148.) Dr. Williams prescribed a sleeping aid and told Wright to return as needed. (R. at 1148.)

These findings on Wright's brain studies may be a result of Wright's long-term overuse or abuse of cough medicine. It does not appear that the physicians who evaluated her for her brain dysfunction symptoms were aware of this history, however. In fact, it does not appear that her primary healthcare provider, Nurse Practitioner Davidson, knew of her substance abuse problem until February 7, 2005. (R. at 964.) Davidson's notes contain a reference on this date to a family member calling and asking Davidson to talk to Wright about her addiction to over-the-counter cough

-8-

medicine. (R. at 964.) According to the family member, Wright was consuming three large bottles of cough medicine a week. (R. at 964.) There is no evidence in the record that Davidson addressed this with Wright at that time. (R. at 1178.)

On July 1, 2005, Wright was seen by Meridith A. Brewer, a counselor with the Bristol Regional Counseling Center, for an emergency psychological assessment at the Bristol Virginia Jail. (R. at 633-35.) Brewer found that Wright did not pose a suicide or homicide threat and recommended that she follow up with outpatient treatment. (R. at 634-35.) Brewer diagnosed Wright with depressive disorder and placed her then-current Global Assessment of Functioning, ("GAF"), score at 55.[2] (R. at 634.)

On July 11, 2005, Wright finally admitted her substance abuse problem to Davidson. (R. at 1235.) Wright complained on feeling "real down, crying," being emotional and sleeping all the time. (R. at 1235.) Wright told Davidson that she was addicted to Robitussin DM. (R. at 1235.) Wright said that she had been arrested for shoplifting on February 5 and had spent 10 weeks in jail before being placed on probation. (R. at 1235.) Wright stated that she was sleeping up to 18 hours a day and had gotten out of bed for only 30 minutes the day before. (R. at 1235.) Davidson diagnosed severe depression and noted that Wright had decided to go to the emergency department at BRMC. (R. at 1235.)

_____

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51-60 indicates that an individual has "[m]oderate symptoms …OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

On initial assessment at BRMC, Wright was alert and cooperative with a depressed mood and flat affect. (R. at 1031.) Robert A. Sutherland, a therapist with Frontier Health Crisis Intervention, completed an emergency assessment of Wright's mental condition on that day and recommended outpatient mental health treatment. (R. at 1035-38.) Wright told Sutherland that she had been arrested on February 5 for shoplifting Robitussin cough medicine. (R. at 1036.) She said that she had been drinking a bottle of cough medicine a day for the past 15 years. (R. at 1036.) Sutherland stated that Wright's judgment, impulse control, insight and attention/concentration were all fair. (R. at 1037.) He stated that Wright's mood was appropriately sad and that her affect was appropriate to her mood. (R. at 1037.) Sutherland diagnosed Wright with depression and placed her GAF score at 50.[3] (R. at 1037.) Wright was discharged later that day. (R. at 1032.)

Wright returned to the emergency department at BRMC complaining of generalized weakness, staggering and dizziness on August 3, 2005. (R. at 1268-75.) The nursing notes state that Wright's family was requesting a toxicology screening for a possible overdosing of her medication. (R. at 1271.) According to the physician's note, Wright was suffering from overmedication. (R. at 1273.) She was told to discontinue some of her medication and was discharged home later that same day in stable condition to follow up with Davidson. (R. at 1274.)

It appears that Wright attended only four counseling sessions with a licensed

---

[3]A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ...OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

clinical social worker.[4] Wright's first session with the social worker was on August 11, 2005. (R. at 1228.) Wright told the social worker that she was seeking therapy for depression. (R. at 1228.) She told him that she had been addicted to cough syrup and shoplifting to support her habit. (R. at 1228.) Oddly, the social worker's note states that Wright told him that she never had consumed alcohol. (R. at 1228.) Wright denied any suicidal ideations, but stated that she was tired all the time with no energy, no appetite, poor sleep and confusion. (R. at 1228.)

On September 1, 2005, Wright told the social worker that her misdemeanor shoplifting charge had been changed to a felony. (R. at 1224.) She requested a letter stating that she needed therapy rather than a jail sentence. (R. at 1224.) Wright stated that she had remained "clean" since her arrest. (R. at 1224.) She stated that she had attended one Alcoholics Anonymous, ("AA"), meeting and one Narcotics Anonymous, ("NA"), meeting since her last therapy session. (R. at 1224.) The social worker noted that they had discussed her treatment options and agreed that her best option, based on her financial constraints, was attending daily AA or NA meetings and counseling. (R. at 1224.) On September 8, 2005, the social worker noted that Wright had attended two more meetings. (R. at 1223.) On September 22, 2005, the social worker noted that Wright had attended four NA meetings. (R. at 1219.)

On October 14, 2005, Wright was admitted to Ridgeview Psychiatric Hospital after trying to slash her wrists. (R. at 1256-59.) Wright reported feeling hopelessness, helplessness and worthlessness. (R. at 1257.) Wright also reported intermittent feelings of agitation, mood lability, impulsivity, distractibility and problems with

---

[4]The name of the licensed clinical social worker is not legible. (R. at 1223-24, 1228.)

anger management. (R. at 1257.) The admitting physician noted that it was impossible to evaluate Wright's depression while she was still abusing cough syrup. (R. at 1330.) Wright was stabilized on medication and discharged on October 22, 2005, with diagnoses of bipolar disorder, anxiety disorder and the need to rule out substance abuse (cough syrup dependency). (R. at 1256.) Wright's then-current GAF score was placed at 50 at admission but 60 at the time of discharge. (R. at 1256.) Wright was instructed to follow up with outpatient therapy and was referred to Dr. Ashvin A. Patel, M.D., for psychiatric care and Nurse Practitioner Davidson for primary care. (R. at 1256.)

Upon intake with Bristol Regional Counseling Service on November 11, 2005, Wright told the intake worker that she had been using hallucinogens daily for approximately 15 years. (R. at 1187, 1191.) Wright also saw Dr. Patel on November 11, 2005. (R. at 1196-98.) Upon intake, Wright told Allyson Burke, M.S.W., with Dr. Patel's office, that she had been "hooked" on cough medicine for the previous 15 years. (R. at 1198.) Wright said that she would consume at least one large bottle a day in an attempt to help her sleep. (R. at 1198.) She stated that she had been arrested three times for shoplifting cough medicine and was on probation. (R. at 1198.) Dr. Patel diagnosed depressive disorder, anxiety disorder and mixed personality disorder and placed Wright's then-current GAF score at 50. (R. at 1196.) Dr. Patel prescribed Klonopin, Effexor and Seroquel and recommended Wright begin seeing a therapist and attending group therapy sessions. (R. at 1196.) Wright was discharged on May 22, 2006, for never attending any sessions after her intake. (R. at 1187-95.)

Before knowing about Wright's addiction to cough syrup, Nurse Practitioner

Davidson completed a Medical Evaluation form on December 30, 2004, which stated that Wright was "unable to work" and would remain so for more than 90 days. (R. at 1025.) Davidson also stated that Wright was restricted from lifting items weighing more than 10 pounds, bending over, stooping or reaching for objects, sitting for more than one hour at a time, standing for more than one hour at a time or walking more than 50 feet. (R. at 1026.) Davidson listed Wright's primary diagnoses as diabetes mellitus, type II, uncontrolled, hypertension, uncontrolled, sleep apnea, encephalopathy, COPD and congestive heart failure. (R. at 1025.)

Wright saw Sharon J. Hughson, Ph.D., a licensed clinical psychologist, on January 28, 2005, for a psychological evaluation at her attorney's request. (R. at 465-68.) Wright reported crying three to four times a week for 20 minutes and feeling anxious easily. (R. at 465.) She attributed her psychological problems to her diabetes and never having received or sought psychological treatment. (R. at 465.) Hughson noted that Wright was fully oriented, and she denied homicidal or suicidal ideation. (R. at 466.) Although Wright denied difficulty relating to others, Hughson noted she had difficulty relating to her. (R. at 467.) Wright reported driving, taking care of her personal hygiene, managing the family money, watching television, listening to the radio, shopping, cooking, performing housework, using the telephone, visiting others and receiving visits and accompanying her son to doctor's appointments. (R. at 467.) Wright stated that she enjoyed reading and "shooting baskets" with her son. (R. at 467.)

Wright told Hughson of previous drinking and legal problems, but did not tell her about her addiction to cough syrup or the amount that she consumed daily. In fact,

Wright told Hughson that she had not consumed alcohol in three years. (R. at 466.) She denied any history of drug abuse. (R. at 467.) Wright told Hughson that she had started drinking at age 20 and that during her heaviest drinking from age 38 to 40, she consumed 12 cans of beer a day. (R. at 465.) Wright stated that she had been previously convicted for forgery of her ex-husband's checks. (R. at 465.) She also stated that she had been convicted of breaking and entering a neighbor's house to get medicine for a sick child and of shoplifting cough medicine "for a child." (R. at 465-66.)

The Beck Depression Inventory, ("BDI"), indicated a mild to moderate level of depression. (R. at 467.) The Beck Anxiety Inventory, ("BAI"), indicated a moderate level of anxiety. (R. at 468.) Hughson diagnosed Wright with major depressive disorder, recurrent, mild, generalized anxiety disorder, somatoform disorder, not otherwise specified, and dependent personality disorder. (R. at 468.)

On March 6, 2005, Hughson also completed a mental assessment, finding that Wright had a good ability to follow work rules, to relate to co-workers, to deal with the public, to function independently and to understand, remember and carry out simple job instructions. (R. at 469-70.) She found that Wright had a fair ability to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance. (R. at 469-70.) In all other areas of adjustment, Hughson found that Wright had poor or no abilities. (R. at 469-70.)

On April 26, 2005, Davidson completed a physical and mental assessment of

-14-

Wright's work-related abilities. (R. at 1020-23.) On the physical assessment, Davidson stated that Wright could lift items weighing up to 20 pounds occasionally and that Wright could stand and walk a total of two hours in an eight-hour workday. (R. at 1023.) Davidson stated that these restrictions were due to shortness of breath and fatigue caused by congestive heart failure, COPD and status post-cerebrovascular accident. (R. at 1023.) Davidson stated that Wright's ability to sit was not limited. (R. at 1023.) Davidson stated that Wright could occasionally climb, stoop, kneel, crouch and crawl, but could not balance. (R. at 1020.) She stated that Wright's abilities to reach, to handle, to feel, to push/pull, to see, to hear or to speak were not affected by her impairments. (R. at 1020.) Davidson also stated that Wright should not work around heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity or vibration. (R. at 1020.)

On the mental assessment, Davidson stated that Wright had a seriously limited, but not precluded, ability to maintain attention and concentration and to understand, remember and carry out complex and detailed job instructions. (R. at 1021-22.) Davidson stated that Wright's ability to understand, remember and carry out simple job instructions was limited, but satisfactory. (R. at 1022.) Davidson stated that Wright's abilities in all other areas was unlimited or very good. (R. at 1021-22.)

On December 23, 2005, Wright was transported to from the Sullivan County Jail to BRMC with complaints of suffering a seizure while in jail. (R. at 1307-13.) Emergency personnel reported that Wright was confused when they arrived to transport her to the hospital. (R. at 1308.) Based on a normal examination and normal CT scan of Wright's head, the treating physician stated that he was doubtful she had

-15-

suffered an actual seizure. (R. at 1312.) Wright was discharged in stable condition later that evening. (R. at 1311.)

Wright was seen again by Bristol Regional Counseling Center on an emergency basis at the Bristol Virginia Jail on June 16, 2006. (R. at 645-47.) Samantha Slagle, M.S.W., evaluated Wright and found her to be extremely disoriented and confused. (R. at 645.) The jail reported to Slagle that Wright had forced herself to throw up several times the night before and had urinated and defecated on herself. (R. at 645.) It also was reported that Wright had used toilet paper to tie herself onto her bed while sitting in her own feces. (R. at 645.) According to Wright, she began smoking cigarettes and marijuana and drinking alcohol at age 15. (R. at 645-46.) Wright also stated that she smoked cigarettes and marijuana and drank alcohol up until she was placed in jail six months earlier. (R. at 645-46.) Wright also stated that she drank an 8-ounce bottle of cough syrup everyday from age 30 until she was placed in jail. (R. at 646.) Wright denied any other drug use. (R. at 646.)

Slagle noted that Wright had difficulty focusing on the questions posed. (R. at 646.) Wright's speech was slowed and unintelligible. (R. at 646.) Slagle stated that Wright's judgment, impulse control and insight were all minimal. (R. at 646.) Slagle diagnosed depressive disorder, generalized anxiety disorder, hallucinogen dependence and personality disorder. (R. at 646.) Slagle placed Wright's then-current GAF score at 40. (R. at 646.) Slagle recommended that Wright be taken off suicide watch. (R. at 646.)

On October 10, 2006, Kathy Miller, M.Ed., a licensed psychological examiner,

evaluated Wright. (R. at 1356-61.) Miller performed a mental status exam and clinical interview. (R. at 1359.) Wright stated that at one time she would drink two eight-ounces bottles of cough syrup twice a day, but she stated that she had not consumed any cough medicine in approximately a year. (R. at 1356.)  Miller stated that Wright seemed socially confident and comfortable. (R. at 1356.) She stated that Wright understood her instructions, but demonstrated varied concentration. (R. at 1356-57.) Wright told Miller that she had previously worked as an x-ray technician for 21 years, but quit because she got tired of the job. (R. at 1358.)  Wright said that she could no longer work because she could not remember anything. (R. at 1358.)

Miller found Wright alert, oriented, cooperative and pleasant with a mildly restricted affect within normal limits. (R. at 1358.) Miller stated that Wright appeared of average intelligence and fairly emotionally stable on her medications. (R. at 1358.) Miller stated that Wright communicated in a clear, coherent manner. (R. at 1359.) Miller diagnosed bipolar disorder in good pharmacological control with mild problems with concentration and memory. (R. at 1360.) Miller placed Wright's then-current GAF score at 65.[5] (R. at 1360.)

Miller stated that Wright's ability to understand did not appear to be significantly limited. (R. at 1360.) She stated that Wright had mild problems with memory and concentration, but that her persistence, social interaction and adaptation

---

[5]A GAF score of 61-70 indicates that the individual has "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning …, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-17-

did not appear to be significantly limited. (R. at 1360-61.)

On October 20, 2006, Louis A. Perrott, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment for Wright. (R. at 1362-64.) Perrott stated that Wright was moderately limited in her ability to understand, remember and carry out detailed job instructions. (R. at 1362.) In all other areas, Perrott stated that Wright's abilities were not significantly limited. (R. at 1362-63.) Perrott stated that Wright was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. at 1364.)

Perrott also completed a Psychiatric Review Technique form, ("PRTF"), on October 20, 2006. (R. at 1365-77.) Perrott stated that Wright had mild restrictions of activities of daily living and mild difficulties in maintaining social functioning. (R. at 1375.) He found that she had moderate difficulties in maintaining concentration, persistence or pace and had suffered one or two episodes of repeated decompensation. (R. at 1375.) Perrott noted that Wright's bipolar disorder had responded well to treatment with medication. (R. at 1377.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Wright on October 20, 2006. (R. at 1378-85.) In reaching his conclusions, Dr. Surrusco noted that many of Wright's impairments were well-controlled with treatment. (R. at 1379-80.) In particular, he noted that Wright's congestive heart failure was now "well compensated." (R. at 1379.) He stated that she had experienced good control of her diabetes on oral

-18-

medication. (R. at 1379.) He noted that Wright used a CPAP machine to address her sleep apnea.(R. at 1379.) He further stated that, although Wright had been diagnosed with COPD, all of her chest exams have been "consistently clear." (R. at 1380.)  Dr. Surrusco stated that Wright could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 1379.)  He stated that Wright could stand and/or walk, with normal breaks, for up to a total of about six hours in an eight-hour workday and could sit, with normal breaks, for a total of about six hours in an eight-hour workday. (R. at 1379.)  Dr. Surrusco stated that Wright's abilities to push and pull and to use hand and foot controls were unlimited. (R. at 1379.) He stated that she had no postural, manipulative, visual, communicative or environmental limitations. (R. at 1380-82.)

On October 31, 2006, Nurse Practitioner Davidson completed a Medical Evaluation form which stated that Wright was "unable to work" and would remain so for more than 90 days. (R. at 1386-87.) Oddly, Davidson also checked boxes on the form stating that she had not advised Wright to decrease her work hours for health-related reasons, had not advised Wright to take a leave of absence for health-related reasons and had not advised Wright to quit her job for health-related reasons. (R. at 1387.) Davidson listed Wright's primary diagnoses as major depressive disorder and generalized anxiety disorder. (R. at 1386.) She listed Wright's secondary diagnoses as hypertension, bipolar disorder, fatty liver disease, COPD, asthma, congestive heart failure, hypothyroidism and diabetes. (R. at 1386.)

Wright was seen by Bristol Regional Counseling Center again on April 19, 2007. (R. at 648.) On this date, Wright stated that she was "hooked" on cough

-19-

medicine. (R. at 648,)   Wright stated that she did not follow through with treatment and counseling after her 2005 inpatient psychiatric admission because of lack of money. (R. at 648.)  Wright claimed that she had not consumed any cough medicine since her psychiatric discharge in 2005. (R. at 648.) An x-ray of Wright's  lumbar spine taken on April 17, 2009, showed only mild degenerative changes. (R. at 623-24.) On September 18, 2009, Wright's blood pressure was so high that her treating nurse practitioner, Cathy Shadden, recommended that she go straight to the emergency department. (R. at 610-12.)

Wright was admitted to BRMC on July 17, 2010, complaining of nausea, vomiting and chest pain. (R. at 555-57.) A stress test performed on Wright on July 19, 2010, was normal. (R. at 579.)   A heart attack was ruled out, and Wright was discharged on July 22, 2010, with her medical conditions stable. (R. at 553-54.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a),

416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 12, 2007, the ALJ denied Wright's claims. (R. at 664-81.) The ALJ found that Wright met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2005. (R. at 666.) The ALJ found that Wright had not engaged in substantial gainful activity since the alleged onset date. (R. at 666.) The ALJ also found that the medical evidence established that Wright had severe impairments, namely hypertension, COPD, diabetes mellitus, type II, a bipolar disorder, an anxiety disorder, a personality disorder and a substance addiction disorder in remission. (R. 666.) The ALJ found that Wright did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 667.) The ALJ found that Wright retained the residual functional capacity to perform light work that did not require her to work around smoke, pollen or other respiratory irritants, that did not require more than

occasional climbing, balancing, stooping, kneeling, crouching or crawling and that required less than complex tasks. (R. at 677.) The ALJ found that Wright could not perform her past relevant work. (R. at 679.) Based on Wright's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Wright could perform jobs existing in significant numbers in the national economy, including those of a cashier, a retail sales person, an interviewer and a receptionist. (R. at 680.) Thus, the ALJ found that Wright was not disabled under the Act and was not eligible for benefits. (R. at 681.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

In her brief, Wright argues that the ALJ erred in his finding as to her residual functional capacity. In particular, Wright argues that the ALJ erred in his rejection of the medical opinions of Psychologist Hughson and Nurse Practitioner Davidson. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-17.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Based on my review of the record, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his residual functional capacity finding. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). "Thus it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays*, 907 F.2d at 1456.

The ALJ specifically rejected Davidson's October 31, 2006, assessment that Wright was unable to work. (R. at 677.) In particular, the ALJ noted that Davidson listed Wright's primary diagnoses as major depressive disorder and generalized anxiety disorder. (R. at 677.) The ALJ noted that Davidson was not a medical doctor or a mental health professional. (R. at 677.) He also noted that Davidson's opinion was inconsistent with the findings of Miller's October 10, 2006, consultative assessment and Wright's own reports of her daily activities. (R. at 677.) The ALJ also specifically rejected Hughson's 2005 assessment because her opinions were inconsistent with Wright's own report of her activities and with the results of Hughson's depression and anxiety scale testing. (R. at 668-69.) This weighing of the medical evidence by the ALJ is proper. Further, the ALJ's residual functional capacity assessment is supported by the mental assessment of Perrott, as well as the physical assessment of Dr. Surrusco. In fact, it appears that Perrott and Dr. Surrusco were the only medical experts who had the benefit of reviewing Wright's complete mental and physical health history in completing their assessments. Based on Wright's many conflicting

-23-

statements regarding her symptoms, substance abuse, treatment and diagnoses over the years, this fact alone would justify the ALJ's giving greater weight to the state agency experts' opinions.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Wright's residual functional capacity; and

3. Substantial evidence exists to support the ALJ's finding that Wright was not disabled under the Act and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wright's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the decision of the Commissioner denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §

636(b)(1)(C) (West 2006 & Supp. 2011):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 17th day of February, 2012.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-25-